UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

RANDY RIDENHOUR,

                                  No. CV04-1358-MO

              Plaintiff,

                                  OPINION AND ORDER

      v.

SPENCER ABRAHAM,
SECRETARY OF THE
DEPARTMENT OF ENERGY,

                      Defendant.

**MOSMAN, J.,**

       Plaintiff Randy Ridenhour filed this suit against Spencer Abraham in his official capacity as the Secretary of the United States Department of Energy ("DOE"), for employment discrimination, and for judicial review of a decision of the Merit System Protection Board ("MSPB") upholding the Bonneville Power Administration's ("BPA") decision to suspend and demote Mr. Ridenhour.  Mr. Ridenhour served as the manager for Logistics Services in the Transmission Business Line of the BPA, supervising 136 employees.  After investigating Mr. Ridenhour's misconduct in the use of the agency's computer and email systems, the BPA suspended Mr. Ridenhour and demoted him from his GS-15 position to a GS-13 in August 2003. Currently before the court is defendant's motion for summary judgment (#36) asserting that Mr. Ridenhour cannot show the MSPB decision was arbitrary or capricious, nor can he establish retaliation in violation of Title VII.  For the reasons stated below, defendant's motion for summary judgment is GRANTED.

PAGE 1 - OPINION AND ORDER

I.    BACKGROUND

    A.    Facts

        1.    "Computer Misconduct"

The BPA has a policy allowing for limited personal use of email and the internet at work.
The policy prohibits the creation, downloading, viewing, copying, or transmission of sexually
explicit or sexually-oriented materials.  Certified Administrative Record ("CAR") at 424-29.
BPA managers, including Mr. Ridenhour, were responsible for implementing and enforcing these
policies.  *Id*.  On January 25, 2002, Mr. Ridenhour did enforce the BPA's "reasonable limited
personal use" policy by proposing the removal of Peter Poling, one of his subordinates, for
"Conduct Unbecoming a Federal Employee."  Def.'s MSJ at 4.[1]  The specifications against Mr.
Poling included the downloading, viewing, and storing of sexually-explicit materials on a
government computer, but did not involve sending or receiving such materials through email.
CAR at 441-50.

On December 30, 2002, Mr. Ridenhour sent an email entitled "Biking anyone?" to fellow
BPA Tom Von Muller.  The email contained an attachment photo of several mostly-naked
women riding bicycles.  CAR at 573-74.  On January 17, 2003, Mr. Von Muller responded in
kind, sending Mr. Ridenhour a new attachment entitled "Casual Fridays."  CAR at 576-77.
Mr. Ridenhour was on detail to another position when this email arrived, and when on detail, his
secretary, Donell Henry, would screen his emails.  She opened this email message and found

---

[1] The "Poling Letter" (Mr. Poling's response to the discipline proposed by Mr. Ridenhour)
was the subject of Mr. Ridenhour's motion (#14) to compel in July 2005.  After in camera
review, the court denied the motion on the grounds that this material was not relevant.  The
proposed discipline letter written by Mr. Ridenhour is part of the record. CAR at 441-50.

photos of unclothed or partially unclothed women. CAR at 454. A similar occurrence happened

one week later, with an email titled "Outgunned." Ms. Henry also opened an email with the

subject line "Need a mechanic?" to find a picture of a woman lying on the floor of a garage with

tools lying on her chest and stomach. CAR at 455. These events were brought to the attention

of Mr. Ridenhour's supervisor, Marge Nelson, who requested an internal investigation into

Mr. Ridenhour's email and internet use on February 11, 2003. Jacobson Decl. Ex. 2.

Mr. Ridenhour's case was investigated along with 18 related computer misuse cases. Pl.'s Resp.

at 6.

  The investigation by Cyber Security uncovered many instances of Mr. Ridenhour's

improper computer use, including the sending and receipt of emails inside and outside the BPA

containing sexually explicit material. Mr. Ridenhour's messages in these emails indicate he was

a willing participant rather than a passive recipient. For example, in an email sent to Mr. Von

Muller containing a picture of a vagina tattooed with butterfly wings, Mr. Ridenhour writes,

"I know you will like this one!" CAR at 570-71. Mr. Ridenhour also responded to a picture of

12 nude women sent by Mr. Von Muller, "Now that was GOOD!!!!!!!!!!! Thanks for sharing!"

CAR at 605.

  On February 24, 2003, when Mr. Ridenhour returned to work, his second level

supervisor, Mr. Maher, confronted him about these emails, and then decided to temporarily detail

Mr. Ridenhour out of his managerial position pending investigation. Silver Decl. Ex. 3, p. 8.

    2.  "Other Misconduct"

  In February 2003, C.J. McVein of the BPA employee relations department, was

investigating rumors of Mr. Ridenhour's "other misconduct," including improper relationships

PAGE 3 - OPINION AND ORDER

with a female coworker and a female intern. Pl.'s Resp. at 4. Near the end of February 2003, Ms. McVein and BPA Attorney Joseph Bennett decided to elevate the investigation to a "fact finding" for which Mr. Bennett retained an outside investigator, Lewellyn Fischer. Mr. Bennett requested Mr. Fischer to investigate five areas regarding Mr. Ridenhour's alleged misconduct: (1) a DUII arrest on July 17, 2002; (2) Christmas party 2002 activities involving alcohol and driving; (3) his relationship with female subordinate Melanie Davies; (4) his relationship with female extern Jessica Tejernia, including the photo of her he kept on his desk; and (5) improper emails he sent and received. Pretrial Order at 4.

Mr. Ridenhour played a role in hiring both Melanie Davies and student-intern Jessica Tejernia. Silver Decl. Ex 3, pp. 2, 5. He served as a "mentor" to both women. *Id*. His closed-door meetings with Ms. Davies were the subject of many rumors at the BPA. *Id*. at p. 4. During Ms. Tejernia's internship, she gave Mr. Ridenhour a high-school graduation photograph that he displayed in his office. *Id*. at 6-7. Ms. Tejernia also accompanied Mr. Ridenhour on a day-trip to Richland, Washington for a site-visit. CAR at 349.

On December 20, 2002, Mr. Ridenhour attended three back-to-back Christmas parties with BPA employees. At the first party at Jake's in Vancouver, Mr. Ridenhour danced with Ms. Davies and left the party with her to attend a retirement party at the Quay restaurant. CAR at 341-44. Some observers found Mr. Ridenhour's "close" dancing to be inappropriate. Ms. Davies and Mr. Ridenhour then went to the third party at the home of Ms. Chipman, a BPA co-worker. Ms. Chipman noticed that Mr. Ridenhour's manner became loud, funny, and unreasonable, which led her to believe he was inebriated. It was also "obvious" to another manager, Ann Scholl, that "Randy had been drinking too much." Fischer Report at 4. Partygoers convinced Ms. Davies to

PAGE 4 - OPINION AND ORDER

drive Mr. Ridenhour when they left.  She drove his vehicle to Jake's, where she retrieved her own

vehicle, and then Mr. Ridenhour and Ms. Davies both drove themselves home in their own

vehicles.  CAR at 343-46.

On March 3 or 4, 2003, Mr. Maher approached Mr. Ridenhour, and asked him to produce

his driver's license.  CAR at 1452; Silver Decl. Ex 3, pp. 48-49.  Mr. Ridenhour did produce a

valid license.

On March 28, 2003, Mr. Fischer interviewed Mr. Ridenhour concerning the topics

suggested by Mr. Bennett.  Mr. Ridenhour admitted that he was arrested for a DUII in July 2002,

and that he subsequently entered a one-year diversion program in which he pledged he would

not drink and operate a motor vehicle.  CAR at 322, 375.  This diversion program began in

September 2002 and ended in September 2003.  Mr. Ridenhour admitted to Mr. Fisher that he

drank alcohol at all three Christmas parties in December 2002.  CAR at 341-46. Additionally, he

admitted that he drove his car to all three parties, including driving from the first to the second

and third with Ms. Davies.  *Id*.  Mr. Fischer did not ask Mr. Ridenhour questions pertaining to

the e-mails discovered by Ms. Henry, but Mr. Ridenhour volunteered that the e-mails were

"private" and had nothing to do with his ability to do his job.  CAR at 363-64.

On April 15, 2003, Mr. Fischer completed his report and sent it to Mr. Bennett.  Bennett

Decl. Ex 1, pp. 1-2.  Mr. Fischer summarized his fact-finding, and concluded in part that the

evidence regarding Mr. Ridenhour's relationships with female subordinates was inconclusive and

conflicting.  *Id*. at 4.  Mr. Fischer's report does not contain conclusions or recommendations

regarding Mr. Ridenhour's computer-related misconduct.  Based on drinking and driving

information discovered in Mr. Fisher's interview, Mr. Maher decided to revoke Mr. Ridenhour's

work-related driving privileges on April 23, 2003.  Jacobson Decl. Ex. 7, p. 2.

       3.     Mr. Ridenhour seeks redress

On March 31, 2003, Mr. Ridenhour filed a written complaint under the BPA's

Harassment Free Workplace Policy ("HFWP").  Mr. Ridenhour complained about feeling

"harassed" as a result of Mr. Fischer's inquiries during the interview on March 28, 2003 and as a

result of Mr. Maher asking him if he had a valid driver's license.  CAR at 1452-53.  On May 1,

2003, BPA's Deputy Administrator Steve Hickok responded to Mr. Ridenhour's HFWP

complaint and informed him that while the inquiries may have been unwelcome, they were work-

related and therefore he found no harassment.  CAR at 1454-55.

In early May, 2003, Mr. Ridenhour received copies of anonymous letters concerning a

"porn ring" at the BPA, including one letter that named Mr. Ridenhour and four others allegedly

involved.  CAR at 623-30.  On May 6 and 19, 2003, Mr. Ridenhour brought the anonymous

letters to the attention of Mr. Maher regarding rumors of a "porn ring" at BPA.  CAR at 1460.

In response to these, and other letters, the BPA management published two agency-wide

announcements condemning anonymous letter writing.  CAR at 639.  On May 19, 2003, after the

BPA issued this newsletter, Mr. Ridenhour sent a note to Mr. Maher informing him that he had

received at least two more letters accusing him of being a sexual predator that he found to be

"threatening."  Mr. Ridenhour inquired as to what management would do about this situation.

Pl.'s Ex. 36.  That same day, Mr. Maher responded and informed Mr. Ridenhour that the letter

problem had been discussed with BPA counsel, Mr. Bennett, and management had explored

possible action.  Mr. Ridenhour thanked Mr. Maher for his attention, and expressed his

appreciation for whatever BPA is doing to deal with this "hostile stuff."  CAR at 1466.

On May 30, 2003, Mr. Ridenhour first sought EEO counseling.  It is undisputed that

Mr. Ridenhour received notice of his proposed discipline on May 27, 2003, prior to his seeking

EEO counseling.  Def.'s Concise St. Mat. Facts ¶ 11; Pl.'s Concise St. Mat. Facts ¶ 11.

Mr. Ridenhour also accepts that he was interviewed by BPA management regarding his DUII

arrest, and his relationship with female subordinates on February 24, 2003, more than 45 days

prior to his seeking EEO counseling.  Def.'s Concise St. Mat. Facts ¶ 13; Pl.'s Concise St. Mat.

Facts ¶ 13.  The topics covered in this initial EEO counseling included the suspension of driving

privileges, sexual harassment/hostile work environment due to anonymous letters, and the May

27 proposed adverse employment action.

On June 6, 2003, Mr. Ridenhour filed a formal grievance concerning Mr. Maher's April

23, 2003 decision to temporarily suspend Mr. Ridenhour's work-related driving privileges.  CAR

at 120.  After meeting with Mr. Ridenhour in early July, Ruth Bennett, the deciding official and

acting Chief Operating Officer, denied Mr. Ridenhour's grievance on July 11, 2003.  Jacobson

Decl. Ex. 6, p. 1.

On July 17, 2003, Mr. Ridenhour filed his formal EEO complaint.  CAR at 169-173.

Mr. Ridenhour also sent an e-mail to Ms. Bennett on July 17, 2003 to thank her for keeping him

informed on the status of the proposed adverse action and informing her that he just filed a

formal EEO complaint.  CAR at 1480.

B.    Procedural History

On May 27, 2003, Mr. Maher proposed that Mr. Ridenhour be suspended for 30 days and

demoted to a GS-13 non-managerial position based on the charge, "Conduct Unbecoming a

Federal Manager." CAR at 99-108. BPA officials supported this charge with 16 separate

specifications of misconduct, all related to Mr. Ridenhour's computer misconduct. CAR at 101-

03.

On June 17, 2003, Mr. Ridenhour submitted a detailed written reply to Ms. Bennett, the

official appointed to determine proper discipline, in response to Mr. Maher's notice of proposed

adverse action. CAR 110-18. He stated, "I failed to appreciate the potential significance of

my receipt and forwarding of these e-mails. I knew the BPA policy allowed private e-mail

communication and I considered the subject emails to be private." CAR at 112. He also

expressed his belief that the subject e-mails were not "pornographic." *Id*. Mr. Ridenhour

seriously disputed only one of the 16 specifications, that is, the accusation that he "encouraged"

other BPA employees to violate BPA's internet security policy when he forwarded an email

message to several employees during a "yellow alert" that contained a link to an internet site

containing a cartoon video joke on the story of "Jack Schitt." CAR at 432, 474. The BPA

internet policy provides that internet use is strictly limited to business use only during yellow

alerts. CAR at 431-32.

On August 1, 2003, Ms. Bennett sustained the adverse action proposed by Mr. Maher –

a 30-day suspension without pay and a demotion to a GS-13 non-managerial position – for

Conduct Unbecoming a Federal Manager. CAR at 87-92; 186-87.

Mr. Ridenhour appealed to the MSPB the BPA's discipline for his alleged conduct

unbecoming a federal manager. Prior to the MSPB hearing, the parties engaged in written

discovery and took depositions. Def.'s MSJ at 22. Mr. Ridenhour sought discovery of the

Fischer investigation against him regarding the "other misconduct," conduct unrelated to his computer misconduct, upon which the proposed adverse action was based. Pl.'s Resp. at 7. Mr. Bennett, the attorney for the BPA, succeeded in shielding this Fischer report from discovery on the grounds that it was irrelevant to Mr. Maher's proposed adverse action based only on the computer misconduct specifications and it constituted attorney work-product (i.e., made in anticipation of litigation).

On March 29, 2004, the ALJ issued a subpoena for the deposition of Patricia McVein, a member of the employee relations department who started investigating Mr. Ridenhour in February 2003. CAR at 2321-24. Because Ms. McVein retired from the BPA, however, the BPA could not order this ex-employee to attend, and instead Mr. Bennett informed her that she would be treated like any other private citizen who could decide to comply with a subpoena or not. CAR at 922-24. Defendant argues Mr. Ridenhour's counsel made no effort to enforce the subpoena or compel Ms. McVein's attendance at the MSPB hearing. Def.'s MSJ at 14.

The MSPB Administrative Law Judge ("ALJ") conducted a two-day evidentiary hearing on May 27-28, 2004. At that hearing, ALJ Farcy weighed the credibility of witnesses, and included these credibility assessments in his subsequent decision. CAR at 858-89.

On July 24, 2004, after the MSPB hearing, the ALJ issued a decision finding the BPA offered substantial evidence that Mr. Ridenhour had engaged in inappropriate conduct set forth in the specifications, there was a reasonable nexus between Mr. Ridenhour's actions and the agency, and the penalty was reasonable. CAR at 883-85. Finally, the ALJ found Mr. Ridenhour failed to prove his affirmative defense that defendant retaliated against him in violation of Title VII. CAR at 871-73.

II.    DISCUSSION

Generally, the MSPB is authorized to review "'adverse employment actions' which fall into one of five categories: a removal, a suspension of more than 14 days, a reduction in grade, a reduction in pay, or a furlough of 30 days or less. *Sloan v. West*, 140 F.3d 1255, 1259 (9th Cir. 1998) (citing 5 U.S.C. § 7512(1)-(5)).  The MSPB also has "pendent jurisdiction over discrimination claims brought in connection with an 'adverse action' otherwise appealable to it." *Sloan*, 140 F.3d at 1259.  When a federal employee claims he was affected by both an "adverse employment action" and a related Title VII violation, administrative remedies may be exhausted for Title VII purposes by asserting both claims before the MSPB – this is what is known as a "mixed case complaint."  *Id*.

Final decisions of the MSPB are generally reviewed in the Federal Circuit Court of Appeals.  5 U.S.C. § 7703(b)(1).  Mr. Ridenhour seeks review in this court because federal employees adversely affected by a final order or decision of the MSPB in a "mixed case" may obtain judicial review of that order or decision in federal district court.  *Sloan*, 140 F.3d at 1260 (citing 29 C.F.R. § 1614.310(b) (1997)).  The district court reviews the MSPB's determinations regarding the Mr. Ridenhour's non-discrimination claims deferentially under an arbitrary and capricious standard.  5 U.S.C. § 7703(c).  The discrimination claims are subject to *de novo* review.  5 U.S.C. § 7702(e)(3).

A.    MSPB Decision

Mr. Ridenhour's complaint challenges the MSPB decision to uphold his suspension and demotion on the grounds that it is "arbitrary, capricious and contrary to law."  Pl.'s Compl. ¶ 47.  This court may set aside the decision of the MSPB on Mr. Ridenhour's nondiscrimination claims

PAGE 10 - OPINION AND ORDER

only to the extent that, upon review of the administrative record, the court finds any agency action, finding, or conclusion to be: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Defendant argues the MSPB's final decision easily satisfies this deferential standard of review, and therefore it is entitled to summary judgment.

An agency may take an adverse employment action such as a suspension or demotion only for such cause as will promote the efficiency of the service. 5 U.S.C. § 7513(a). To satisfy this standard at the MSPB stage, defendant needed to show by a preponderance of the evidence that (1) the charged conduct occurred; (2) there is a nexus between the conduct and the efficiency of the service; and (3) the penalty imposed was reasonable. *James v. Dale*, 355 F.3d 1375, 1378 (Fed. Cir. 2004). Although Mr. Ridenhour asserts the MSPB decision was arbitrary and capricious, he was unable to substantiate this charge in his brief or during oral argument. Indeed, at oral argument, Mr. Ridenhour's counsel was unable to cite any legal authority for the proposition that the MSPB decision in this case was arbitrary and capricious. Under the highly deferential review I must give to the MSPB, I find the ALJ's decision was supported by substantial evidence for all three of the required elements.

1.    The charged conduct occurred.

Mr. Ridenhour admitted to 15 of the 16 specifications regarding his computer misconduct. CAR at 866, 868. As to the one specification with which he disagreed, encouraging others to use the internet for non-business purposes during a yellow alert, ALJ Farcy found Mr. Ridenhour was not credible. CAR at 867. It is undisputed that a yellow alert was in effect at

the time Mr. Ridenhour e-mailed co-workers a message that contained a link to an internet site containing a cartoon video joke on the story of "Jack Schitt." CAR at 474. Additionally, ALJ Farcy commented that in violating this BPA policy about heightened security during a yellow alert, Mr. Ridenhour engaged in conduct unbecoming a federal manager.

       2.      There is a nexus between the conduct and the efficiency of the service.

ALJ Farcy found defendant met the nexus requirement because there is a sufficient nexus between an employee's conduct and the efficiency of the service where conduct occurred in part at work. *Parker v. U.S. Postal Serv.*, 819 F.2d 1113, 1116 (Fed. Cir. 1987); *see also* Pl.'s Ex. 39 (BPA Policy Personnel Letter 751-1) ("If the misconduct occurred on the job, there is generally a presumed nexus.") Here, all of the alleged computer misconduct occurred at the BPA, using agency equipment and the agency e-mail system. CAR at 870. Mr. Ridenhour does not contest this element.

       3.      The penalty imposed was reasonable.

Mr. Ridenhour argues the penalty imposed was unreasonable because "a mere warning was sufficient to correct [his] computer misuse." Pl.'s Resp. at 2. Essentially, Mr. Ridenhour argues his extreme punishment was contrary to the BPA's policy to impose the minimum discipline necessary to correct and not punish behavior. Pl.'s Resp. at 7. Mr. Ridenhour cites as error the fact that Ms. Bennett did not consult with the employee relations department concerning appropriate discipline as BPA policy required her to do prior to deciding a penalty. Pl.'s Resp. at 18; Pl.'s Ex. 39. The policy requires supervisors/managers to "seek assistance and guidance from the employee relations staff" prior to selecting corrective action. Pl.'s Ex. 39, p. 2. Mr. Ridenhour also criticizes Ms. Bennett for her admitted unfamiliarity with the "Douglas

PAGE 12 - OPINION AND ORDER

factors," the considerations relevant to making adverse decisions initially identified in the case of *Douglas v. Veterans Admin.*, 5 MSPB 313 (1981).  Despite this lack of familiarity, however, Ms. Bennett apparently applied the factors in her decision, discussing both the proposal and Mr. Ridenhour's letter response to the same.  CAR at 87-92.

Mr. Ridenhour faults the BPA for concluding he lacked the potential for rehabilitation, a finding upon which the harsh discipline was justified.  *Id*.  The BPA apparently reached this conclusion based on comments Mr. Ridenhour made to Mr. Fischer during his interview on March 28, 2003, including: characterizing the transmittal of sexually explicit materials as an issue separate from job performance and describing the e-mail usage as "personal" and "private" rather than public.  CAR at 107.  Ms. Bennett also expressed her belief that Mr. Ridenhour's conduct was particularly reprehensible in light of his managerial position, and given the fact that he recently disciplined a lower level employee for substantially similar conduct.  CAR at 90-91.  Ms. Bennett also justified the penalty on Mr. Ridenhour's failure to acknowledge the gravity of his offense, and his apparent attempt to minimize the nature of the activity.  CAR at 91.

Additionally, Mr. Ridenhour's response brief concentrates on comparing his discipline to the lesser discipline imposed on other "high level employees" for similar or more egregious conduct.  Pl.'s Resp. at 13-17.  For example, GS-14 Asset Strategy Manager Clune received a one-day suspension for what Mr. Ridenhour describes as computer misuse of "greater extent and severity."  Pl.'s Resp. at 14.  Mr. Ridenhour does not offer further detail to support this comparison, and I agree with ALJ Farcy's and Ms. Bennett's review of the factors distinguishing Mr. Ridenhour's case from those of other BPA employees.  *See* CAR at 90, 877.  ALJ Farcy rejected Mr. Ridenhour's comparison in part because, unlike another manager who had received

PAGE 13 - OPINION AND ORDER

"risque e-mail in the workplace," Mr. Ridenhour engaged in both sending and receiving sexually explicit e-mails, and he enforced the BPA policy against an employee who violated it.  CAR at 881.  This shows he had knowledge of the policy and was on notice of the "potential for severe disciplinary action."  *Id*.  Moreover, the comparison to Mr. Weddick, another manager, was weak because Mr. Weddick was reprimanded for visiting pornographic internet sites, not for transmitting sexually explicit e-mails.  CAR at 878.  Therefore, there were no other "similarly situated employees," as that term is understood in MSPB adjudications, with whom a comparison would be helpful in assessing the reasonableness of the penalty proposed for Mr. Ridenhour. CAR at 877-78.

Mr. Ridenhour faults other aspects of the MSPB hearing.  First, Mr. Ridenhour argues that Mr. Bennett's advice to Ms. McVein constitutes intentional tampering with a witness.  Pl.'s Resp. at 12.  With the benefit of Ms. McVein's testimony, according to Mr. Ridenhour, ALJ Farcy would have reached different conclusions.  Pl.'s Resp. at 10.  This is because in her videotaped testimony made to the Assistant U.S. Attorney, Ms. McVein indicated that her investigation of "other misconduct" could have resulted in discipline imposed on Mr. Ridenhour, but BPA officials chose to base the discipline solely on charges of computer misconduct for which there was "nothing plaintiff could say to defend" his actions.  Pl.'s Resp. at 11. Mr. Ridenhour argues this strategic choice is evidence that he received harsh discipline "without due process of law."  Pl.'s Resp. at 11.  This argument is not compelling.  By all indications, Ms. McVein's testimony would have revealed *additional* bases on which Mr. Ridenhour could have been disciplined.  To the extent this would have changed the ALJ's decision, it would have resulted in a potentially harsher punishment.

PAGE 14 - OPINION AND ORDER

Second, Mr. Ridenhour contends ALJ Farcy committed clear error in ruling on the nondiscoverability of the Fischer report and the relevance of other cases of manager misconduct. Pl.'s Resp. at 21. Essentially, Mr. Ridenhour contends the MSPB decision was arbitrary because, insofar as the disciplinary decision was based on the "other misconduct," Mr. Ridenhour was harmed by the adverse discovery decisions that made it impossible for him to confront those charges in an adversarial proceeding. Defendant responds that these discovery decisions only matter if the "other misconduct" was in fact a basis for discipline, which is not supported by the record. As to the Fischer Report, ALJ Farcy was correct when he summarized the majority of its contents as discussing issues not related to the computer misconduct. I agree with the defendant's argument that it is hard to see how this "other misconduct," even if disproved, would somehow exonerate Mr. Ridenhour on the amply supported charges of "computer misconduct." Def.'s Reply at 7. Without citing legal authority as to the propriety or impropriety of the ALJ's evidentiary rulings, Mr. Ridenhour's argument fails, especially in light of this court's deferential review.

Third, Mr. Ridenhour urges the court to find the MSPB decision arbitrary on the grounds that two different managers expressed inconsistent views of the evidence against Mr. Ridenhour: Ms. McVein apparently thought there was enough evidence of "other misconduct" upon which Mr. Ridenhour could and should be disciplined while Mr. Maher decided to discipline Mr. Ridenhour based only upon the "computer misconduct." I do not find that this kind of inconsistency compels a finding of arbitrariness. This is not an inconsistency in which management disagreed about whether discipline should be imposed, but upon how many

PAGE 15 - OPINION AND ORDER

different bases Mr. Ridenhour could be charged with misconduct.  Ms. McVein's position, if followed, arguably would have resulted in a harsher penalty to Mr. Ridenhour.

Overall, Mr. Ridenhour's claims of legal error regarding the penalty imposed and the ALJ's decisions at the MSPB hearing are unconvincing.  Mr. Ridenhour offers many complaints about the process, but his showing does not come close to overcoming the significant hurdle created by the "arbitrary and capricious" standard of review.  Therefore, defendant's motion for summary judgment is granted because Mr. Ridenhour has failed to come forward with any genuine issue of fact to suggest the MSPB decision to uphold his suspension and demotion was arbitrary, capricious or contrary to law.

B.    Title VII Retaliation

Mr. Ridenhour's discrimination claims are reviewed *de novo* and subjected to the ordinary summary judgment standards.  Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Evaluating whether a genuine issue of material fact exists requires the court to view the record in a light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  If the movant initially shows that no genuine issue exists for trial, the non-movant cannot then rest on the pleadings but must respond with evidence setting "forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus.*

PAGE 16 - OPINION AND ORDER

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks and citation omitted).

Mr. Ridenhour alleges defendant took action against him in retaliation for his protected activity. Title VII prohibits employers from discriminating against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation under Title VII requires Mr. Ridenhour to show: (1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment discrimination. *Porter v. Cal. Dept. of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005). If Mr. Ridenhour provides sufficient evidence to show a prima facie case of retaliation, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. *Id*. If defendant sets forth such a reason, Mr. Ridenhour bears the ultimate burden of submitting evidence indicating that the defendant's proffered reason is merely a pretext for a retaliatory motive. *Id*.

After reviewing the record and hearing oral argument, there are no issues of material fact concerning the protected activity or causal link elements of the prima facie case. Even if Mr. Ridenhour showed a prima facie case, he fails to raise an inference of pretext in response to defendant's legitimate non-discriminatory reasons for the adverse action.

1.      Mr. Ridenhour's Prima Facie Case of Retaliation

Defendant concedes Mr. Ridenhour meets the first two elements of the prima facie case, but this concession attempts to limit the extent of Mr. Ridenhour's protected activity to include

only his pursuit of the EEO claim starting on May 30, 2003. Defendant's main argument

regarding the prima facie case is that Mr. Ridenhour cannot establish the third element, the causal

link, because the adverse action was proposed on May 27, 2003, *before* Mr. Ridenhour engaged

in what defendant concedes is Mr. Ridenhour's *only* protected activity. Def.'s MSJ at 31.

Under *Clark County School District v. Breeden*, 532 U.S. 268 (2001), defendant's causal link

argument is very strong, but its strength is undermined if the court finds that Mr. Ridenhour

engaged in protected activity prior to his pursuit of an EEO claim.

> a.    Protected activity

Mr. Ridenhour asserts in his brief that there were "several protected activities of plaintiff

prior to Mr. Maher's proposed adverse action" on May 27, 2003, including: (1) the March 31,

2003, formal written complaints (HFWP complaint) alleging he felt "harassed" by Mr. Fischer's

inquiries and by Mr. Maher asking him to produce a valid driver's license on March 3 or 4, 2003;

and (2) the complaints to Mr. Maher on May 6 and May 19, 2003 regarding the anonymous

letters constituting a hostile work environment. Pl.'s Resp. at 19-20. At oral argument, however,

Mr. Ridenhour conceded that an employer's decision to investigate reports or widespread rumors

of managerial misconduct regarding inappropriate relationships with subordinates and violations

of a DUII diversion program constitutes a reasonable and non-harassing action on the part of the

employer. Thus, Mr. Ridenhour's only other possible "protected activity" preceding his EEO

contact is when he complained to Mr. Maher regarding the anonymous letters and the allegedly

hostile work environment they created.

Mr. Ridenhour argues, "[i]t is well settled that an employee engages in protected activity

when the employee complains of a harassing work environment caused by co-workers or

management." Pl.'s Resp. at 20.  He asserts such complaints need not be made to the EEO and "need only be reasonably believed by the employee." *Id*.  To support his argument that these complaints about the anonymous letters constitute "protected activity," Mr. Ridenhour relies on *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  I disagree with Mr. Ridenhour's argument because *Ray* is factually distinguishable and because the Supreme Court has interpreted the Ninth Circuit's "reasonable belief" language narrowly.  In *Ray* the Ninth Circuit remarked that in addition to formal and informal complaints made to the EEO, complaints made to a supervisor may also qualify as "protected activity."  217 F.3d at 1240 n.3.  What Mr. Ridenhour fails to recognize is the subject matter of the complaint.  In *Ray*, the plaintiff complained about management's unfair treatment of women employees compared to their male coworkers, activity that is more clearly protected by Title VII than the complaints made by Mr. Ridenhour.  *Id*. at 1237.  Here, Mr. Ridenhour is not complaining that he was treated unfairly compared to his female coworkers.  Instead he says he was subject to a hostile work environment created by anonymous letters decrying the "porn ring," of which Mr. Ridenhour was an alleged member.

In the Supreme Court's 2001 *Breeden* case, the Court narrowed the kinds of activities upon which plaintiffs may base retaliation claims.  532 U.S. at 270-71.  In *Breeden*, the plaintiff brought a retaliation claim alleging she was punished for complaining to management about a co-worker's sexual comment.  *Id*. at 269-70.  The Court did not go so far as to disagree with the Ninth Circuit's interpretation of Title VII retaliation law, but significantly narrowed the potential expansiveness of its reach:

> The Court of Appeals for the Ninth Circuit has applied § 2000e-3(a) to protect employee "opposition" not just to practices that are actually "made unlawful" by Title VII, but also to practices that the

PAGE 19 - OPINION AND ORDER

> employee could reasonably believe were unlawful.  We have no
> occasion to rule on the propriety of this interpretation, because
> even assuming it is correct, no one could reasonably believe that
> the incident recounted above violated Title VII.

*Breeden*, 532 U.S. at 270.  Thus, the question under *Breeden* is whether the anonymous letters

written by co-workers created the kind of hostile environment a reasonable person could believe

violated Title VII's prohibition against discrimination because of sex.  If the answer to that

question is no, then Mr. Ridenhour did not engage in protected activity when he complained of

the letters to his supervisor such that the subsequent adverse action taken by his employer could

be deemed retaliation in violation of Title VII.  I find that a person in Mr. Ridenhour's position

could not have reasonably believed that a collection of anonymous letters, admittedly hostile in

tone and sexual in subject matter, constituted harassment or discrimination because of his sex.

To be actionable under Title VII, hostile environment sexual harassment requires

discrimination – harassment *because of* the employee's sex.  *Oncale v. Sundowner Offshore*

*Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment

in the workplace; it is directed only at *discriminat[ion]* . . . because of . . . sex.")(internal

quotation marks omitted); *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000).

Specifically, to establish a claim based on a hostile working environment as a result of sexual

harassment, a plaintiff must prove he was subject to verbal or physical conduct of a harassing

nature because of his sex, the conduct was unwelcome, and the conduct was sufficiently severe

or pervasive to alter the conditions of the plaintiff's employment.  *See Meritor Sav. Bank, FSB v.*

*Vinson*, 477 U.S. 57, 67 (1986).  The plaintiff must also show that his "work environment was

both subjectively and objectively hostile." *Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1034 (9th Cir. 2005).

When viewing the facts in the light most favorable to Mr. Ridenhour, it would seem that the letters were unwelcome and there may be questions of fact as to whether the circulation of those letters was pervasive enough to alter the conditions of his employment. That said, Mr. Ridenhour fails to create a genuine issue of material fact as to the first requirement, that he was subject to verbal or physical conduct of a harassing nature *because of his sex*. At oral argument, both sides mistakenly conflated the angry tone and sexual content of the letters with a hostile work environment. However, it is simply not the case that "workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. This is especially true where the tone and content of the allegedly hostile environment stem from, or are a reaction to, a sexually-charged environment created by plaintiff. There is no dispute that Mr. Ridenhour viewed, received, and transmitted sexually-explicit materials at his place of work. When his co-workers anonymously wrote letters objecting to this sexually inappropriate behavior, it is not the case that a person in Mr. Ridenhour's position could perceive these letters to be harassment against Mr. Ridenhour because of his sex. It would be a perversion of the protections of Title VII to base a hostile work environment theory on co-workers' vehement objections to Mr. Ridenhour's workplace pornography, just because those objections have sex as their subject matter.

It must be remembered that defendant's motion for summary judgment addresses Mr. Ridenhour's retaliation claim, not a claim for sexual harassment. The above analysis goes to

PAGE 21 - OPINION AND ORDER

whether Mr. Ridenhour engaged in protected activity when he complained to his managers about the circulation of anonymous letters that were hostile in tone and sexual in subject matter. It must be noted that the letters named not only Mr. Ridenhour, but at least three other members of the "porn ring," including a woman. I find that, because no reasonable person could believe that such letters would constitute sexual harassment based on the named actor's sex, Mr. Ridenhour did not engage in protected activity when he complained about the letters to management.

To the extent Mr. Ridenhour attempts to hold defendant liable for failing to remedy the situation, I find that his argument fails. An employer may be liable for the actions of an employee's co-workers who created a hostile work environment if the employer knew of the harassment creating the environment and did not take prompt remedial action. *Folkerson v. Circus Circus Enter. Inc.*, 107 F.3d 754, 755-56 (9th Cir. 1997). Mr. Ridenhour did bring these letters to management's attention, and it is undisputed that management took action in investigating what could be done and in publishing two agency-wide announcements condemning anonymous letter writing. CAR at 639. Mr. Maher's same-day response to Mr. Ridenhour's May 19, 2003 e-mail expressing concern indicates management was taking these complaints seriously and responded promptly. Due to the difficulty and expense of pursuing the anonymous actors, the BPA did not take further action. Even viewed in the light most favorable to Mr. Ridenhour, this is not the kind of record on which a rational jury could find that he was subject to a hostile working environment due to management's failure to eliminate completely the anonymous letter writing. Therefore, Mr. Ridenhour did not engage in "protected activity" until he first made contact with the EEO on May 30, 2003.

PAGE 22 - OPINION AND ORDER

b.    Adverse employment action

Both parties agree the BPA took adverse employment action against Mr. Ridenhour by proposing (May 27, 2003) and then executing (August 2, 2003) the 30-day suspension and two-grade demotion of Mr. Ridenhour.

c.    Causal link

Mr. Ridenhour cannot establish the requisite causal link for retaliation given that his supervisor proposed the suspension and demotion on May 27, 2003, prior to Mr. Ridenhour's engagement in protected activity when he first contacted the EEO counselor on May 30, 2003.

Mr. Ridenhour also tries to establish retaliation on the grounds that before Ms. Bennett rendered her final decision in July 2003, he had engaged in protected activity and therefore "Ms. Bennett's retaliation is sufficient to create an issue for trial." Pl.'s Resp. at 19. This argument is expressly foreclosed by *Breeden*. 532 U.S. at 272. Where an employer contemplates an adverse action *before* a plaintiff engages in protected activity, the fact that the adverse action (here, a demotion and suspension) occurs *after* the protected activity is immaterial. *Id.* ("Employers need not suspend previously planned [adverse actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not definitively determined, is no evidence whatever of causality.").

2.    Defendant's Legitimate, Non-Retaliatory Reason for its Action

Assuming Mr. Ridenhour made a prima facie case of discrimination, defendant offered legitimate and non-discriminatory justifications for the demotion, as flushed out more fully by the MSPB proceedings: Mr. Ridenhour violated the BPA's internet policy while on the job and while in a management position. Mr. Ridenhour's computer misconduct negatively impacted the

PAGE 23 - OPINION AND ORDER

BPA's efficiency, and therefore, he was disciplined for conduct unbecoming a federal manager. I find this to be a legitimate reason for suspending and demoting Mr. Ridenhour.

        3.     Mr. Ridenhour's Evidence of Pretext

Continuing with the assumption that Mr. Ridenhour made a prima facie case, and in light of the legitimate, non-retaliatory reason offered by defendant for the suspension and demotion, Mr. Ridenhour now bears "the ultimate burden of submitting evidence indicating that the [defendant's] proffered reason is merely a pretext for a retaliatory motive." *Porter*, 419 F.3d at 894. In meeting his ultimate burden, Mr. Ridenhour's responsive brief lacked any discussion of pretext, but during the summary judgment hearing, counsel offered three possible arguments for pretext.

First, Mr. Ridenhour argues pretext is evidenced by the "undisputed" fact that an apology from Mr. Ridenhour would have sufficed to ameliorate the situation, and yet, the BPA justified its extreme penalty on its finding that Mr. Ridenhour's conduct was so egregious. If a mere apology would have sufficed to correct his behavior, then his conduct was not actually viewed as so severe. In other words, Mr. Ridenhour posits there was a disconnect between what the BPA did without an apology versus what they would have done with an apology. Moreover, he argues pretext is evidenced by the fact that he did apologize which the BPA simply "dismissed."

Mr. Ridenhour's argument is based on a false premise. It is not "undisputed" that a mere apology from Mr. Ridenhour would have sufficed to ameliorate the situation. In his concise statement of material facts, Mr. Ridenhour offered the following: "The proposing official, Mr. Maher, considered plaintiff an "exemplary employee" and may well have left him in his position as a GS-15 manager, *if plaintiff had only apologized* for his involvement in the e-mails."

PAGE 24 - OPINION AND ORDER

Pl.'s  Conc. St. Facts ¶ 3 (emphasis added).  In its responsive statement of facts, defendant

disputed Mr. Ridenhour's assertion:

> Defendant denies admitting that [Mr.] Maher testified in his
> deposition that he may well have left plaintiff in his GS-15
> management position if plaintiff had *only* apologized.  The plaintiff
> has inserted the word "only." . . . The testimony shows that [Mr.]
> Maher was going to require more than an apology from the
> plaintiff.  [Mr.] Maher, in response to a hypothetical scenario
> posed by plaintiff, testified that he *might* have left plaintiff in his
> management position if he apologized *and* plaintiff understood the
> seriousness of his misconduct and the impact it had on his ability
> to be an effective manager.  [Mr.] Maher noted that this did not
> happen.

Def.'s Reply to Pl.'s Resp. to Def.'s Conc. St. Facts ¶ 3.  In addition to the false premise on which

it is based, this argument is also unavailing as it does little to show defendant's legitimate reasons

for the demotion were untrue or were a pretext for discrimination.

Second, Mr. Ridenhour attempts to show pretext by asserting defendant has offered

shifting or inconsistent explanations for its adverse employment decision.  According to

Mr. Ridenhour, defendant initially sought to discipline him for the events in late 2002 and early

2003 surrounding his "other misconduct," upon which at least one BPA manager, Ms. McVein,

*would have* imposed discipline.  Later, a different reason was offered by a different manager,

Mr. Maher, for demoting Mr. Ridenhour – computer misconduct.  I do not think this showing

constitutes inconsistent or shifting explanations, let alone pretext.  Ms. McVein opined

Mr. Ridenhour's "other misconduct" constituted grounds upon which he could be disciplined,

but this is not the same as offering a different explanation for the discipline that was actually

imposed.  When there are two kinds of misconduct at issue, each capable of exposing the

PAGE 25 - OPINION AND ORDER

wrongdoer to discipline, there is nothing "inconsistent" about management choosing to pursue one kind of misconduct rather than the other or both.

Third, Mr. Ridenhour contends pretext is shown in Mr. Maher's proposed adverse action that uses Mr. Ridenhour's complaints against him.  In the "penalty analysis" portion of Mr. Maher's proposed adverse action, one of the eight factors the proposing official must consider is "notoriety."  CAR at 106.  While it is true that in this section, Mr. Maher refers to Mr. Ridenhour's complaints regarding the anonymous letters, I disagree with the assertion that the complaints were being used against Mr. Ridenhour in a retaliatory manner.  Rather, Mr. Maher's apparent purpose in referencing Mr. Ridenhour's complaints was to show that even Mr. Ridenhour was aware of the notoriety regarding his computer misconduct, stating:

> As you are aware to some extent already, you are named in several
> anonymous letters . . . from employees wanting to know what BPA
> is doing to combat the "porno ring."  You yourself have requested
> management's assistance in protecting you from what you perceive
> to be a "hostile work environment" generated by these letters.

CAR at 107.  Based on this information, Mr. Maher concluded his discussion of the notoriety element by stating, "the knowledge and outrage generated by your actions appears to be widespread within BPA."  *Id.*  Thus, I find this unreasonable interpretation of Mr. Maher's notoriety analysis is insufficient to create an inference of pretext.

III.    CONCLUSION

Mr. Ridenhour fails to present evidence establishing a genuine issue of material fact regarding both the propriety of the MSPB decision upholding his demotion and his claim for retaliation.  Under the highly deferential standard of review governing the MSPB claim, Mr. Ridenhour has failed to establish any issue of fact that could undermine the MSPB's decision

PAGE 26 - OPINION AND ORDER

as unsupported by substantial evidence or as arbitrary or capricious.  The MSPB conducted a

two-day hearing during which the BPA proved there was substantial evidence showing the

charged conduct occurred, a nexus between the conduct and the efficiency of the service, and

the reasonableness of the penalty.  Finally, Mr. Ridenhour's retaliation claim fails to survive

summary judgment because there is no causal link between any true protected activity and the

adverse employment action, and even if there were, Mr. Ridenhour fails to present any issue of

fact capable of creating an inference of pretext.  Therefore, defendant's motion for summary

judgment is GRANTED in full.

     IT IS SO ORDERED.

     DATED this __29th__ day of March, 2006.


     /s/ Michael W. Mosman_____
     MICHAEL W. MOSMAN
     United States District Court

PAGE 27 - OPINION AND ORDER